Mark Mausert
NV Bar No. 2398
Sean McDowell, Esq.
NV Bar No. 15962
729 Evans Avenue
Reno, NV 89512
(775) 786-5477
Fax  (775) 786-9658
mark@markmausertlaw.com
sean@markmausertlaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF NEVADA

KEVIN WOWO,                                    CASE NO.: 3:24-cv-00061-ART-CSD

        Plaintiff,

    vs.                                        **SECOND AMENDED COMPLAINT AND JURY DEMAND**

ITS LOGISTICS, LLC,

        Defendant.

_____/

COMES NOW plaintiff, through counsel, pursuant to this Court's Order of January 23, 202, hereby brings a Second Amended Complaint and Jury Demand and hereby complains of defendant as follows:

### Jurisdiction, Venue & Jury Demand

1. Plaintiff is a man of African-American descent, who was previously employed by defendant.  Plaintiff was subject to harassment based on his race throughout almost the entirety of his tenure with defendant, as well as retaliatory hostility and/or retaliation.  Plaintiff has obtained a Notice of Right to Sue from the Equal Employment Opportunity Commission, issued on December 27, 2023.  A Copy of the  Notice of Right to Sue accompanied the original "Complaint and Jury Demand" and is incorporated herein.  Plaintiff obtained this Notice of Right to Sue pursuant to exhausting administrative remedies, as required by law.  This original Complaint and Jury Demand was timely filed in accord therewith.  Plaintiff hereby requests a jury trial re all issues so triable.

2.  Defendant ITS Logistics is a corporation, limited partnership, limited liability company, partnership, or some other legal entity which previously employed plaintiff in northern Nevada.  At all times herein mentioned defendant had at least fifteen employees working at least twenty weeks per year.  Defendant maintains and operates a sizeable physical facility or facilities in northern Nevada, i.e., in Washoe County, Nevada, at which all, or almost all, actions, statements and/or omissions herein alleged occurred.

3.  This Court has subject matter jurisdiction per 28 U.S.C. 1343.  The Court has subject matter jurisdiction because plaintiff is a man of African-American descent who is alleging he was subject to a racially hostile work environment in violation of 42 U.S.C. 2000e, et seq., and/or that he was subject to retaliation, as prohibited by Title 42.

4.  This Court has venue re this action pursuant to 42 U.S.C. 2000e-5(f)(3) because all, or almost all of the actions, statements and omissions which form the basis for this lawsuit occurred in northern Nevada, i.e., in Washoe County, Nevada, in the geographical area of this judicial District.  Further, plaintiff resides in this District and defendant maintains a place of business in this District, where at it regularly does a large amount of business.

<u>First Cause of Action</u>

(Racially Hostile Work Environment)

5.  Plaintiff hereby incorporates the allegations of paragraphs 1 through 4, inclusive, as well as all other paragraphs herein, as though the same had been fully stated.

6.  Plaintiff was employed by defendant from approximately March 7, 2017, until March 1, 2023, in the capacity of a Senior Leadership Associate. Throughout almost the entirety of his employment plaintiff was subjected to racial hostility which a reasonable man of African-American descent would have found to offensive because of race.  Plaintiff did subjectively experience the work environment to be offensive because of race. Instances of racial hostility came to permeate plaintiff's work environment to the point at which that work environment should be deemed to be actionable per Title VII, i.e., racial hostility permeated

plaintiff's work environment per its frequency, severity and duration to the point at which racial hostility materially and adversely altered the conditions of plaintiff's employment; became actionable per Title VII; and compelled plaintiff to constructively discharge from defendant's employ.  A reasonable, hypothetical man of African-American descent would likely have experienced the same work environment as plaintiff did and would likely have suffered comparable emotional distress (and associated feelings and symptoms), and been compelled to constructively discharge.  An integral aspect of the hostility which plaintiff experienced was defendant's protracted and knowing toleration of various forms of racial hostility, sans timely, thorough and fair investigatory efforts by ITS and compounded by effective efforts by ITS to remediate past manifestations of racial hostility and/or prevent future manifestations - which plaintiff reasonably anticipated and which a reasonable, hypothetical man of African-American lineage would also likely have reasonably anticipated.  That is, plaintiff reasonably and predictably apprehended ITS would continue to allow racial hostility in his work environment.   Plaintiff also reasonably and predictably apprehended, as would a reasonable, hypothetical man of African-American lineage in plaintiff's position, that the racial hostility, especially racial hostility targeted directly at him per retaliatory animus resulting from his opposition to racial hostility, would increase in frequency and intensity, and additional and varied forms of retaliatory hostility would manifest.

7.  Plaintiff's work environment was rendered racially offensive based upon a repertoire of conduct which included, but was not limited to, the following: The routine and loud playing of offensive music, aka "gangsta rap" which routinely referred to people of African-American descent as "niggas" or "niggers," and/or other racially-based pejorative terms, and which depicted persons of African-American descent in demeaning and/or offensive roles and situations, including as criminals, convicts, rapists, sexual aggressors, etc.; other ITS Logistics employees openly singing along with various songs which were offensive, e.g., those employees would openly repeat racially offensive statements, including the words "nigga" and

"nigger"; employees of Caucasian descent made racially offensive statements to plaintiff, e.g., they referred to water plaintiff had as "pruno" or "prison wine"; defendant singled out African-American employees for denial of raises; and plaintiff was falsely accused by persons who retaliated against him as the result of plaintiff complaining of their racist behavior.  This conduct occurred openly and frequently, per routine and loud broadcast of such music, accompanied by associated conduct as alleged, on the work premises of ITS, in plaintiff's presence, i.e., within easy auditory range, within the presence of other ITS employees, and in the presence of auditory range of many ITS Supervisors and Mangers - who heard and understood the lyrics of racially offensive songs, while knowing plaintiff and other ITS employees of African-American descent, and women ITS employees could likewise hear and understand racially (and sexually) offensive lyrics.  These circumstances manifested for years, during which plaintiff was employed by ITS.

8.  The routine and loud broadcast of racially offensive music served to negate or nullify any efforts by ITS to disseminate policies against racial harassment and/or discrimination.  Instead, the implicit message ITS allowed to be communicated, on a daily basis, pursuant to permitting the loud broadcast of racially offensive "gangsta rap" music was that other forms of racially offensive statements and/or conduct were permissible in the workplace, and could be indulged in without adverse consequence, notwithstanding ITS's written policies which purported to prohibit racially offensive statements and/or conduct in the workplace.

9.  Plaintiff, in approximately late October, 2022, complained to ITS Supervisor, Samantha Holt of racial hostility.  Supervisor Holt exercised direct supervisory authority over plaintiff at the time he complained to her.  Plaintiff informed Supervisor Holt that  co-employees, Maisie _____, Melissa _____, and Janae _____ had made racially offensive remarks to him and in his presence, and thereby stated and/or implied he was a stereotypical ex-convict of African-American descent.  Plaintiff reasonably apprehended these were based on race, i.e., they were integrally related to the disproportionately high number of

African-Americans in the prison systems of the United States and were in sync with some of the gangsta rap music which were broadcast in plaintiff's presence, and in the presence of the three co-workers, partially identified above.  Mr. Wowo was personally subjected to a series of remarks which stated or implied he was an ex-convict, even after he complained to Supervisor Holt, i.e., such remarks by these three co-employees continued until plaintiff resigned in February, 2023.  Plaintiff was reduced on a daily basis to coping with such remarks and attempted to do so by trying to pass them off as banter.  In fact, plaintiff was offended, based on race - especially after the three continued to racially harass him after he complained to Supervisor Holt.   That is, plaintiff reasonably apprehended, after Supervisor Holt informed plaintiff she would speak with the three employees for the purpose of stopping the remarks, and after the three employees continued to openly make the same or similar remarks, that the remarks did not sound in some sort of misguided attempt at humor, but did in fact, have as their genesis racial animus harbored and/or retaliatory animus.  These co-employees would refer to the gallon containers of pure water Mr. Wowo brought to work as "pruno" - slang for prison wine.  This topic became a standing, repetitive "joke" as far as the three co-employees were concerned and they indulged in this particular harassment on a daily basis in plaintiff's presence, even after plaintiff complained to Supervisor Holt.

10.  Plaintiff complained to Supervisor Holt in late October, 2022, e.g., plaintiff informed Ms. Holt of the "pruno wine" remarks and told her he regarded them as racially offensive.  Supervisor Holt promised plaintiff she would speak to these co-employees in an attempt to cause them to curb this conduct.  All three employees are White, i.e., they appear to be entirely, or alternatively predominantly, of northern European descent.  Plaintiff does not know what, if any, investigative efforts defendant undertook, or what remedial/preventive were taken by ITS. The racially offensive conduct of these employees did not stop and plaintiff continued to be subject to such on a regular and frequent basis until he resigned his employment on March 1, 2023.  ITS did not, to plaintiff's knowledge, take any subsequent

measures, e.g., to determine if any admonition Supervisor Holt directed at the three employees had effectively curtailed the conduct plaintiff complained.  Offensive, racially hostile gangsta music was loudly broadcast within the areas in which these three employees worked prior to plaintiff complaining of their racially hostile remarks, and continued to be loudly broadcast in the areas in which they worked, i.e., such music would have been easily heard and understood by anyone with reasonable good hearing - sans any meaningful and/or consistent efforts by ITS to curtail such broadcasts.

11.  During the interim between late October, 2023, when plaintiff complained to Supervisor Holt and when plaintiff resigned/was constructively discharged on March 1, 2023, the three co-employees named above made racially related prison references not only in plaintiff's immediate presence, but within earshot of some ITS Managers, including Miquan _____ and Tanya _____.  Both Managers appeared to understand the prison reference because they responded with mild laughter.  They failed to take any remedial action.  Both of these Managers were routinely subjected to "gansta rap" music, loudly broadcast on the work premises of ITS at its Sparks facility - where at plaintiff worked from October, 2022, to March 1, 2023.  Plaintiff witnessed these Managers and other ITS Managers in areas where at gangsta rap music was loudly broadcast and witnessed their failure to respond in any way intended to curtail the broadcasts.  Plaintiff witnessed their presence in easy auditory range of the music while the word "nigga" was loudly broadcast.  Plaintiff witnessed, throughout almost the entirety of his employment ITS's managers and/or supervisors within easy auditory range of the broadcast of "gangsta" rap, replete with racist terminology and scenarios and also witnessed the routine toleration by these managers and supervisors of such broadcasts.  On one occasion, plaintiff witnessed Manager Tanya request the ITS employees responsible for broadcasting such music to refrain from playing such music.  The employees switched up the music, i.e., they briefly broadcast another genre of music, but within hours returned to broadcasting gangsta rap music, replete with "nigga' and other, racially offensive content.

12. In late February, 2023, plaintiff was suspended from employment with ITS, apparently based on the false allegations of ITS employee, Maisie _____. Plaintiff was informed by ITS Human Resources Manager, Amanda Hegdahl, that Maisie informed her plaintiff had been discussing prison killings and prison violence on the ITS work premises. Plaintiff was suspended for three days. Plaintiff was eventually allowed to return to work and was paid for the three days after ITS apparently determined Maisie's allegations, as described above, were unfounded. As previously stated, plaintiff reasonably interpreted the references to prison wine and then allegations of discussion of prison violence, as directly relating to race, i.e., to his identity as an African-American. Humans Resources Manager, Tim Aboussleman, who supervised Manager/Supervisor Holt that the allegations re prison violence discussions had been determined to be unfounded and plaintiff should come back to work.

13. No assurance was provided to plaintiff regarding what discipline, if any, and what preventive measures, if any, would be taken relative to the course of racial harassment he endured by three White co-workers and which had escalated to the level of the false allegation which resulted in the suspension of plaintiff's employment. Plaintiff inquired of Manager Aboussleman, what action would be taken in response to the harassment and false allegation. Manager Aboussleman responded by informing plaintiff "[t]here's nothing I can really do about that and just come back and work, and we'll go on from there," or words to that immediate effect. Plaintiff, when faced with the prospect of having to work with three employees who had, on a daily basis, subjected him to racial harassment and had escalated from racially offensive comments to a false report of substantively related misconduct by him, i.e., involving discussion of *prison* violence, reasonably anticipated further escalation would occur - as a result of ITS's refusal to remediate past racial harassment and/or prevent future racial harassment. Consequently, plaintiff resigned his employment, i.e., plaintiff was wrongfully/constructively discharged.

14. Plaintiff reasonably experienced his work environment to be intolerable as a direct

and proximate result of racial hostility which permeated his work environment - based on all facts and circumstances herein alleged, including the loud and frequent broadcast of gangsta rap, replete with racially offensive terms, references to prison gang culture, prison violence, etc., and especially ITS's failure and refusal to meaningfully investigate and/or remediate racial hostility, of which ITS knew, or should have been aware of.   Plaintiff considered his situation, ITS's actions and statements, and failures to act, in context with the routine racial hostility which ITS permitted to permeate the work environment. That is, ITS permitted, on a daily basis, "gangsta rap" music to be loudly broadcast in its work environment. This music was replete with offensive racial terms and scenarios, e.g., "nigga" and depictions of African-American males as criminals and/or convicts, engaging in violence, sexual aggression and various crimes.   Plaintiff was well aware ITS tolerated open expressions of racial hostility re the rap music - in a manner very similar to that which ITS tolerated the continuing racial hostility which was directed at himself, and which continued to escalate.  A reasonable hypothetical African-American man, similarly situated to plaintiff, would likewise likely have experienced plaintiff's work environment as offensive and intolerable, because of race, and would have reasonably foreseen continuing escalation of racial hostility, sans redress by ITS. Plaintiff did perceive and foresee his work situation in that manner and hence regarded his work environment as intolerable, as would have a reasonable, hypothetical African-American man.

15.  Defendant promised plaintiff, at the time plaintiff was hired, it would provide a workplace free of racial hostility.  Notwithstanding being placed on daily notice by virtue of the frequent and loud playing of foul racial songs in the presence of many of its manager, defendant failed to enforce the policy against racial harassment it promised plaintiff it would enforce.  That is, defendant failed to implement timely and/or adequate remedial measures to curtail the broadcasting of racially offensive songs.   ITS persisted with this failure even after plaintiff complained of racial hostility and even after ITS knew, and should have known, the

routine broadcast of music attended by racially offensive terms, and racially offensive scenarios, likely had contributed to the willingness of plaintiff's co-employees to engage in the racially offensive behavior which caused plaintiff to complain. And, plaintiff reasonably apprehended ITS knew, and should have known, that racially offensive music likely resulted in the racial hostility which was personally directed at him, and re which he complained. Plaintiff was also cognizant of ITS's continued failure to forestall the broadcast of racially offensive music in its workplace. Plaintiff reasonably apprehended ITS had made a calculated decision to knowingly permit racial hostility, per the gangsta rap music, employees singing along with such music, and other forms of racial hostility which the broadcast of gansta rap music likely encourage, or was perceived as legitimizing, because ITS regarded the music as a form of motivation for employees who liked the genre of gangsta rap music. Plaintiff predictably and reasonable apprehended ITS regarded any offense and/or distress he would likely experience as the result of racially offensive music and/or predictable associated conduct/statements as an acceptable and collateral consequence. A reasonable, hypothetical employee of African-American lineage, similarly situated to plaintiff would predictably and likely formed the same conclusion. ITS knew, and should have known, plaintiff would so conclude, based on the broadcast of the music, the content of a number of songs, plaintiff's race, the open manner in which some employees sang along with songs, e.g., they articulated offensive, racial terms such as "nigga" in plaintiff's immediate presence and in the presence of other African-American employees, and plaintiff's complaint of racial hostility. Accordingly, plaintiff concluded as alleged herein and this knowledge markedly increased the intensity of the racial hostility plaintiff endured because he came to understand ITS was willing to maintain a blatantly racially hostile work environment in order to maximize profits. That is, in order to avoid upsetting employees who wished to broadcast and sing along with incredibly racially and/or sexually foul and offensive content, and thereby avoid employee turnover, ITS had made a calculated decision to abandon the policies ITS promised would protect plaintiff, and to allow

plaintiff to be subjected, on a daily basis, to racial hostility so long as he remained employed by ITS. Plaintiff perceived that ITS was deliberately forestalling from conducting a thorough investigation, properly remediating past racial hostility and attempting to meaningfully prevent future racial hostility, and instead tacitly permitting and impliedly encouraging racial hostility several months before he constructively discharged. This knowledge was integral to plaintiff's decision to constructively discharge and materially motivated plaintiff's decision to constructively discharge. A reasonable man of African-American lineage, similarly situated to plaintiff, would likely have been offended in comparable intensity to that which plaintiff was as a proximate result of the racial hostility alleged herein, in conjunction with ITS's failures to act and implicit encouragement of racial hostility, and would likely have made the same decision to constructively discharge, contemporaneously with the decision made by plaintiff.

16. In response to plaintiff's February 26, 2023, email, which informed defendant that plaintiff was resigning because of racial hostility/discrimination, defendant attempted to defraud and/or trick plaintiff into waiving his rights pursuant to Title VII of the 1964 Civil Rights Act, i.e., 42 U.S.C. sec. 2000e, et seq. Defendant used the subterfuge of having plaintiff change a partnership interest, or unit, into common stock and then selling that common stock to defendant in order to obtain plaintiff's signature on two Agreements, which became effective on March 10, 2023.

17. The Agreements purported to waive plaintiff's rights related to ownership and sale of the partnership unit, and then common stocks. Consideration, flowing from defendant to plaintiff, was identified as $1,074.65 and that consideration was identified as payment to plaintiff for transfer of his stock interest. Email correspondence occurred between plaintiff and defendant regarding these transactions, i.e., prior to the execution of the two Agreements by plaintiff. Defendant did not disclose to plaintiff, prior to the execution of the two Agreements, defendant's intention to interpret the two Agreements as a waiver of plaintiff's right to pursue his legal rights relative to the racial hostility and/or discrimination which he alleged via his

February 26, 2023, email.  Defendant deliberately concealed this intent for the purpose of attempting to divest plaintiff of his legal rights without paying plaintiff anything, or alternatively, using the de minimus payment, purportedly linked to the stock transfer, or some other duty associated with that transfer, as consideration for a waiver of rights by plaintiff, of which plaintiff was unaware of at the time as a result of defendant's concealment thereof.

18.  Defendant secured plaintiff's signature on the Agreements and subsequently attempted to use the Agreements to bar plaintiff from redressing legal rights attendant to workplace racial hostility and/or discrimination, i.e., defendant claimed the Agreements effected a waiver of plaintiff's rights.  By doing so, defendant acted with oppression, and/or with a fraudulent intent.  Defendant also acted with a retaliatory intent, in anticipation of plaintiff filing a lawsuit, based on workplace hostility and/or discrimination plaintiff alluded to in his February 26, 2023, email.

19.  Defendant's actions, including defendant's failure to inform plaintiff of the actual state of affairs, attendant to negotiating the two March 10, 2023, Agreement, including defendant's concealment by commission and omission of the nature and effect of those Agreements - per defendant's concealed interpretation thereof; and the act of obtaining plaintiff's signature on the Agreements, constituted acts of retaliatory hostility and an act of retaliation.  Defendant acted with oppression, a fraudulent intent, a retaliatory intent and manifested a consciousness of guilt regarding the racial harassment and discrimination which plaintiff alleged on February 26, 2023.  Defendant's actions and concealment by omission or silence, which occurred subsequent to the date of plaintiff's resignation, were integrally related to plaintiff's employment and should therefore be considered acts of retaliatory hostility and an act of retaliation per Title VII.

20.  Any diminution and/or deficiency in plaintiff's work performance was directly and proximately caused by the rampant racial hostility defendant allowed to exist in its work environment and defendant is therefore estopped by relying on such as a basis for justifying any

discipline of plaintiff.

21. As a direct and proximate result of being subject to racial harassment, and a racially hostile work environment and defendant's retaliatory hostility which occurred regarding the two Agreements dated March 10, 2023, plaintiff suffered emotional distress, loss of enjoyment of life, and feelings such as anger and depression. It has been necessary for plaintiff to incur costs and retain counsel in order to attempt to redress the violation of his federally protected right to a workplace free of racial hostility, as well as retaliation and discrimination.

<u>Second Cause of Action</u>

(Retaliation/Racial Discrimination)

22. Plaintiff hereby incorporates the allegations of paragraphs 1 through 21, inclusive, as though the same were fully stated herein.

23. On or about March 1, 2023, as a result of the pervasive racial hostility to which plaintiff was subjected, for years - compounded by knowledge of defendant's history of tolerating racial hostility and the reasonable belief defendant would continue to tolerate racial hostility, in conjunction with plaintiff's knowledge of the inadequate response to his complaint of racial hostility, and ITS's knowledge plaintiff was offended by the racist character of his work environment, but had made a decision to refuse to cure racial hostility - plaintiff resigned his employment with defendant, pursuant to a February 26, 2023, email, whereby plaintiff expressed his intent to resign. Plaintiff's decision to constructively discharge was proximately and reasonably motivated by the incidents of racial hostility alleged herein, ITS's response, and failures to adequately respond, to plaintiff's complaints of racial hostility, plaintiff's knowledge of ITS's long toleration of manifestations of racial hostility in its workplace (especially racially offensive music), and the conclusion plaintiff reasonably arrived at, as alleged herein, that ITS's toleration and/or implicit encouragement of racial hostility was the result of a deliberate decision by ITS - made for the purpose of retaining in its employ and motivating the many employees who wished to hear broadcasts of racially and/or sexually offensive music in ITS's

workplace - and in turn to maximize profits.  A reasonable man of African-American lineage, similarly situated and possessing the same knowledge, would likely and reasonably made the same decision to constructively discharge. Plaintiff was constructively discharged. Constructive discharge is a form of recognized retaliation per  Title VII of the 1964 Civil Rights Act.

24.  Plaintiff's resignation/constructive discharge was reasonable under the circumstances, e.g., on a daily basis defendant allowed its ostensible, paper policy against racial harassment in the workplace to be implicitly repudiated via allowing loud and racially offensive music to be broadcast throughout its work environment - as well as permitting the other conduct alleged herein.  Defendant allowed employees to sing along with such music, e.g., to sing racially offensive terms such as "nigga".  Defendant thereby imparted the implicit message, to the effect (1) its policy against racial harassment was pretextual;  (2) engaging in racially offensive conduct was permissible;  (3) defendant would continue to implicitly ratify racial hostility in its workplace;  (4) defendant had made a deliberate decision to allow racial hostility in order to maximize financial profits; and (5) ITS would continue, indefinitely, to permit manifestations of racial hostility while thereby allowing plaintiff to suffer from emotional and psychological distress.

25.  Defendant's oppressive conduct regarding the two March 10, 2023, Agreements, as alleged above, constitute retaliation - engaged in by defendant in response to plaintiff's February 26, 2023, email and/or plaintiff's resignation - which defendant knew constituted opposition to workplace racial harassment and/or discrimination.  Defendant engaged in this conduct in order to punish plaintiff in response for asserting his right to be free of a workplace permeated with racial hostility, and/or because defendant anticipated plaintiff would engage in additional forms of opposition to racial hostility and/or retaliation, e.g., filing a Charge of Discrimination with either the NERC or the EEOC, and then bringing suit.

26.  As a direct and proximate result, plaintiff was injured as described herein.  Further,

plaintiff sustained economic damages relative to the constructive discharge.

27.  It has been necessary for plaintiff to incur costs and to retain counsel in order to attempt to vindicate his federally protected right to be free of retaliation and/or the constructive discharge, which is a form of retaliation.

WHEREFORE, plaintiff request the following relief:

1.  For an award of compensatory damages;

2.  For an award of punitive damages sufficient to punish and deter defendant from engaging in similar conduct;

3.  For an award of special or actual economic damages, according to proof;

4.  For an award of costs and a reasonable attorney's fee; and

5.  For injunctive relief to compel defendant to adopt and actually enforce a reasonable policy against racial harassment and/or retaliation, and for whatever other relief the Court or jury may deem just.

DATED this 20th day of February, 2025.

/s/ Mark Mausert
Mark Mausert
NV Bar No. 2398
729 Evans Avenue
Reno, NV 89512
TELEPHONE:(775) 786-5477
FACSIMILE: (775) 786-9658
*Attorney for Plaintiff*

## INDEX OF EXHIBITS

December 27, 2023 Issued Notice of Right to Sue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 1

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury that I am an employee of Mark Mausert Law Office; I am over the age of eighteen (18) years; I am not a party to, nor hold an interest in this action; and on the date set below, I sent via the electronic service maintained by the above-mentioned court, a true and correct copy of, **PLAINTIFF'S 2ND AMENDED COMPLAINT,** to the addressee(s) listed below:

Jonathan McGuire
Anthony Hall
Simons Hall Johnston PC
jmcguire@shjnevada.com
ahall@shjnevada.com

DATED this 20th day of February, 2025.

*/s/ Brittaney Martin*
Brittaney Martin
Employee of Mark Mausert &
Sean McDowell