UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

WOWO,

                    Plaintiff,

     v.

ITS LOGISTICS, LLC.,

                    Defendant.

Case No. 3:24-cv-00061-ART-CSD

ORDER ON DEFENDANT'S MOTION TO DISMISS (ECF No. 50), MOTION FOR SUMMARY JUDGMENT (ECF No. 60), AND RELATED MOTIONS (ECF Nos. 58, 59, 66)

Plaintiff Kevin Wowo brings this action against his former employer, ITS Logistics, alleging hostile work environment and retaliation claims under Title VII. After dismissing his previous retaliation claim without prejudice, the Court granted Plaintiff leave to amend. (ECF No. 47.) Plaintiff filed a Second Amended Complaint ("SAC"). (ECF No. 48.) Before the Court are Defendant's partial Motion to Dismiss Plaintiff's retaliation claim (ECF No. 50) and Defendant's Motion for Summary Judgment on all claims due to alleged waiver of Title VII rights (ECF No. 60).

## I.    Factual and Procedural Background

Plaintiff alleges the following facts which are taken as true for the purposes of the Motion to Dismiss: Plaintiff, an African-American man, was employed by Defendant ITS Logistics as a Senior Leadership Associate from approximately March 2017 until March 2023. (ECF No. 48 at 2.)  Plaintiff alleges the following conduct occurred in his workplace: Loud music was routinely played within the earshot of managers which referred to people of African-American descent as "niggas" or "niggers" and "depicted African-American persons in demeaning and/or offensive roles and situations"; other employees sang along to this offensive music and repeated the words "nigga" and "nigger"; White employees

1

referred to Plaintiff's water as "pruno" or "prison wine"; and Defendant denied raises to African-American employees. (*Id.* at 4.) Plaintiff asserts that in permitting this conduct, ITS failed to enforce its own policy against racial harassment, provided to Plaintiff upon being hired. (*Id.*)

Plaintiff also alleges that in late October, 2022, he complained to his ITS Supervisor Holt about racial hostility from his coworkers. (*Id.*) He says he continued to be subjected to racial harassment, including in front of ITS Managers, after his complaint and until his resignation in March, 2023. (*Id.* at 6.) On one occasion ITS Manager Tanya requested that his coworkers "refrain from playing such music." (*Id.*) Hours later, the coworkers returned to the same genre. (*Id.*) He claims that ITS did not, to his knowledge, undertake any subsequent measures to determine if actions taken by ITS leadership actually curtailed the conduct. (*Id.*)

Plaintiff also alleges that in late February, 2023, he was suspended from employment based on false allegations of discussing prison violence on ITS work premises. (*Id.* at 7.) He was returned to work and paid for his time after the allegations had been determined to be unfounded. (*Id.*) Plaintiff claims that he asked Human Resources Manager Tim Aboussleman, who oversees Supervisor Holt, if any action would be taken in response to the false allegations, which Plaintiff experienced as an escalating form of racial harassment. (*Id.*) Plaintiff alleges that he was told "[t]here's nothing I can really do about that." (*Id.*) Based on this failure to take action, Plaintiff resigned from his position at ITS because he "reasonably anticipated further escalation would occur as a result of ITS's refusal to remediate past racial harassment and/or prevent future racial harassment." (*Id.* at 7.)

After he resigned, Plaintiff signed two Agreements related to the ownership and sale of a partnership interest, valuing his stock interest at $1,074.65. (*Id.* at 10.) Defendant did not disclose to Plaintiff prior to the execution of the

Agreements that the contents would waive his right to sue under Title VII. (*Id.* at 10-11.)

On August 8, 2023, Plaintiff submitted his Charge of Discrimination to the Nevada Equal Rights Commission ("NERC"). (ECF No. 50-1.) He received his Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") on December 27, 2023. (ECF No. 48-1.)

## II.   Motion to Dismiss

### a.  Legal Standard

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Under this standard, a district court must accept as true all well-pleaded factual allegations in the complaint and determine whether those factual allegations state a plausible claim for relief. *Id.* at 678-79.

To successfully plead a prima facie case of retaliation under Title VII, a plaintiff must show that (1) they engaged in protected activity, (2), they suffered an adverse employment action, and (3) there is a causal link between said protected activity and the adverse action. *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007); *see also Munoz v. McDonough,* No. 2:21-cv-00430-APG-EJY, 2021 WL 9220191, at *3 (D. Nev. June 28, 2021), *report and*

*recommendation adopted,* No. 2:21-cv-00430-APG-EJY, 2021 WL 9220184 (D. Nev. July 23, 2021). The Ninth Circuit defines "adverse employment action" as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Andreatta v. Eldorado Resorts Corp.,* 214 F. Supp. 3d 943 (D. Nev. 2016) (citing *Ray v. Henderson,* 217 F.3d 1234, 1242–43 (9th Cir. 2000)). Constructive discharge can serve as an adverse employment action for the purposes of a retaliation claim under Title VII. *Mosakowski v. PSS World Med., Inc.,* 329 F. Supp. 2d 1112, 1126 (D. Ariz. 2003) (citing *Jordan v. Clark,* 847 F.2d 1368, 1377 (9th Cir. 1988)).

### b. Analysis

Defendant argues that Plaintiff has failed to state a claim on two grounds: first, that he failed to exhaust his administrative remedies for a retaliation claim under Title VII, and second, that he has not provided a permissible theory of causation between a protected activity and adverse employment.

### i. Failure to Exhaust Administrative Remedies

Defendant argues that Plaintiff's Charge of Discrimination is insufficient to place the EEOC on notice for a charge of retaliation. Plaintiff argues that he clearly stated that he was constructively discharged in his Charge, and his pleading was therefore sufficient to state a claim for retaliation.

Under Title VII, a plaintiff must exhaust her or his administrative remedies by filing a timely charge with the EEOC or appropriate state agency. 42 U.S.C. § 2000e-5(b). A federal court's subject matter jurisdiction over Title VII claims "depends on the scope of . . . both the EEOC charge and the EEOC investigation." *Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir. 1990). Allegations are within the court's jurisdictional scope where they are "like or reasonably related to" the factual allegations in the EEOC charge. *B.K.B. v. Maui Police Dept.,* 276 F.3d 1091 (9th Cir. 2002), *as amended* (Feb. 20, 2002) *overruled on other grounds by Fort*

*Bend Cnty., Tex. v. Davis,* 587 U.S. 541 (2019). "In determining whether the exhaustion requirement has been satisfied, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *Freeman v. Oakland Unified Sch. Dist.,* 291 F.3d 632 (9th Cir. 2002) (internal citations omitted). The Court construes the language of EEOC charges with "utmost liberality." *B.K.B.,* 276 F.3d at 1000.

Plaintiff's Charge of Discrimination states he was discriminated against "due to . . . retaliation" and "subjected to . . . constructive discharge." (ECF No. 50, Ex. 1.) In the box labeled "discrimination based on," Plaintiff wrote "Race, Retaliation, Sex." (*Id.*) On the second page, he alleges that his direct supervisor falsely accused him of timecard fraud, which he claims occurred "on the grounds of my race." (*Id.*) He says the same supervisor failed to respond to his complaints of other racial harassment. (*Id.*) Separately, he claims that another manager falsely accused him of discussing killings and prison in the workplace, which led to his temporary suspension. (*Id.*) He "believe[s] the comments were racially motivated." (*Id.*) Plaintiff concludes that "[o]n March 1, 2023, [he] made the decision to constructively discharge as [he] felt Respondent was unwilling to take any action to address my concerns and [he] believed that management would continue to seek reasons to terminate my employment." (*Id.*)

In his SAC, Plaintiff alleges additional facts that are not in his NERC Charge describing complaints to Manager Aboussleman about being falsely accused of discussing prison violence and requesting that action be taken. (ECF No. 48 at 7.) This protected activity arose out of the same allegedly racially motivated event listed in his Charge and could therefore be considered reasonably related to the claims that he stated. *See Anderson v. Reno,* 190 F.3d 930, 938 (9th Cir. 1999) (finding that although plaintiff did not state claim for retaliation in her EEOC

Charge, retaliation was "part and parcel" of other claims that had been exhausted and therefore could proceed). Liberally construing Plaintiff's Charge, Plaintiff twice describes his complaint as "retaliation" and includes reasonably related facts in his SAC that could plausibly state the elements for a retaliation claim. Investigators would have been on notice that his factual allegations sought to fit into that category. Therefore, Plaintiff has exhausted his claim for retaliation.

### ii. Title VII Retaliation

Plaintiff contends he was retaliated against when his concerns to supervisors were repeatedly and intentionally ignored, leading to his constructive discharge.[1] Defendant argues that Plaintiff has not established a causal connection between his complaints and his decision to resign.[2]

### 1. Protected Activity

"An employee has engaged in a protected act if he 'has opposed any practice made an unlawful employment practice by this subchapter; or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *Brophy v. Day & Zimmerman Hawthorne Corp.*, 799 F. Supp. 2d 1185, 1199 (D. Nev. 2011) (quoting 42 U.S.C. § 2000e–3(a)). A formal or informal complaint of discrimination by an employee constitutes protected activity when a reasonable person would believe that the conduct complained of violates Title VII. *Jernigan v. Alderwoods Group, Inc.*, 489 F. Supp. 2d 1180, 1200 (D. Or. 2007) (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000));

---

[1] While Defendant's motion relies upon Plaintiff's theory that the Agreements constituted retaliation, Plaintiff withdraws this argument in his Response. Therefore, the Court does not address Defendant's arguments regarding the Agreements.

[2] To the extent that Plaintiff alleges his resignation email constitutes both protected activity and an adverse employment action, he is incorrect. An employee must show that they were subsequently subjected to an adverse employment action after engaging in a protected activity. See University of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013) (plaintiff must prove that protected activity was a but-for cause of the alleged adverse action). Otherwise, the third element of a Title VII claim, causation, would be moot.

*Equal Empl. Opportunity Comm'n v. Tesla, Inc.*, 727 F. Supp. 3d 875, 893-94 (N.D. Cal. 2024) (citing *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 963-64 (9th Cir. 2009)).

Plaintiff alleges that he complained to Supervisor Holt in late October 2022, regarding the "pruno wine" remarks, and received a promise that she would speak to his coworkers. (ECF No. 48 at 5.) The conduct did not stop, and to Plaintiff's knowledge, no action was taken in response to his complaint. (*Id.*) In February 2023, Plaintiff was subjected to an investigation based on an allegation that he was discussing prison violence; he was later returned to work when the accusations were held to be unfounded and paid for the time he was absent. (*Id.* at 7.) While the act of being investigated and returned to work is not an adverse employment action, as Defendant observes, *see Coleman v. Telles*, No. 2:24-cv-00930-APG-MDC, 2025 WL 401442, at *6 (D. Nev. Feb. 5, 2025) (citing *Campbell v. Haw. Dept of Educ.*, 892 F.3d 1005, 1013 (9th Cir. 2018)), Plaintiff claims that he told Manager Aboussleman that the false allegations amounted to further harassment by his coworkers. (*Id.*) Plaintiff was then apparently told that there was nothing that Aboussleman could "really do about that," and that he should return to work. (*Id.*) This informal complaint constitutes protected activity.

### 2. Adverse Employment Action: Constructive Discharge

To show constructive discharge, a plaintiff must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 US 129, 147 (2004); *see also Munoz*, 2021 WL 9220191, at *3 (citing *Green v. Brennan*, 578 U.S. 547 (2016)). There is a high bar for constructive discharge claims, "because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was

intolerable." *Poland*, 494 F.3d at 1184. To that end, an employee who resigns without providing their employer a chance to remedy the problem has not been constructively discharged. *Id.* at 1185. Defendant does not dispute that Plaintiff's resignation would meet the standard for an adverse employment action, and therefore this element is considered met.

### 3. Causal Link

Finally, a plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Center v. Nassar*, 570 U.S. 338, 360 (2013). "Causation 'may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Davenport v. Bd. of Trustees of State Ctr. Community College Dist.*, 654 F. Supp. 2d 1073, 1094 (E.D. Cal. 2009) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). A plaintiff can succeed on a retaliation claim if he shows that "protected conduct was a but-for cause—but not necessarily the only cause—" of an adverse employment action. *Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013).

At the pleading stage, a plaintiff "'may allege direct or circumstantial evidence from which causation can be inferred, such as an employer's pattern of antagonism following the protected conduct, or the temporal proximity of the protected activity and the occurrence of the adverse action.'" *Tesla*, 727 F. Supp. 3d at 894 (quoting *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1301 (N.D. Cal. 2020)) (internal quotation marks omitted). There is no "bright-rule about the timing of retaliation. There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation." *Coszalter v. City of Salem*, 320 F. 3d 968, 978 (9th Cir. 2003).

8

In his SAC, Plaintiff argues that weeks before he sent his resignation email to Defendant, he had asked his manager to respond to the ongoing harassment he suffered because of allegedly false allegations of improper conduct at work. His manager ultimately told Plaintiff "there's nothing [he] can really do" about taking an action in response to the harassment and false allegation, and that Plaintiff should "just come back and work, and we'll go on from there." (ECF No. 48 at 7.) In his Complaint, Plaintiff does not allege further facts that indicate that Aboussleman refused to do more in response to Plaintiff's coworkers' claims against him in retaliation for Plaintiff complaining; in fact, this incident is repeatedly framed as an example of a racially hostile work environment. Plaintiff does allege, however, that the racial hostility he experienced continued despite this complaint, and that he feared it would continue to escalate following the false allegations against him. (ECF No. 48 at 8.) At the motion to dismiss stage, inferences are made in favor of the non-moving party, and it is possible to construct a theory under which Plaintiff's managers and supervisors refused to act on his behalf in response to his ongoing complaints of harassment, and the harassment continued. Plaintiff's resignation came within the same month that he alerted a manager to his concerns based on the investigation, his request for recourse was rebuffed, and he continued to suffer through the hostility of his coworkers. Therefore, the Court denies the Defendant's Motion to Dismiss.

### III.   Motion for Summary Judgment

Defendant moves for summary judgment on the grounds that Plaintiff waived his right to sue under Title VII when he executed a Sales and Purchase Agreement and Redemption Agreement with his employer that cashed out his shares in ITS. (ECF No. 60.) Plaintiff argues that the Agreements were not sufficiently clear and unambiguous to constitute such a waiver. (ECF No. 75.)

####    a.  Factual Background

#####       i.  Communication with ITS

The same day that Plaintiff sent his resignation email to several members of the ITS team, he also sent an email to ITS's HR Manager requesting "to sell [his] ownership stake" in the partnership agreement. (ECF No. 59, Ex. 2.) The HR Manager sent Plaintiff two documents titled, "Redemption Agreement" and "Sale and Purchase Agreement," companion agreements intended to perform related functions. (*Id.*, Ex. 3.) The Redemption Agreement converts Plaintiff's units to shares, and the Sales and Purchase Agreement sells Plaintiff's shares. (ECF No. 60 at 4.) Under the Agreements, Plaintiff is considered the "Seller" and Defendant is the "Purchaser."

Plaintiff asked the HR Manager questions about value of the units, to which she advised Plaintiff he could request a legal representative to review the documents. (*Id.*, Ex. 6.) He then followed up twice, asking when the check would be processed into his bank account. (*Id.*, Ex. 3). The Agreements were officially signed and processed on March 10, 2023. (*Id.*)

### ii.  The Agreements

Each Agreement shares similar relevant features which Defendants argue constitute a release of Plaintiff's Title VII claims: a whereas clause, a claims release clause, and an acknowledgement clause.

The Redemption Agreement identifies Plaintiff as the Limited Partner, and includes a whereas clause that states, "the Limited Partner's employment by the Partnership and/or one of its Subsidiaries has terminated." (*Id.*, Ex. 9.)

The claims release is contained in Section 1.2, under the sub-heading "ARTICLE I – THE REDEMPTION," titled "Release," which says that upon redeeming his units, Plaintiff will release "any and all claims . . . including, without limitation" those that relate to the units and Plaintiff's status as a Limited Partner with respect to those units:

> Upon the Redemption, all rights of the Limited Partner with respect to the Redeemed Units shall cease and the Redeemed Units of the Limited Partner shall be cancelled. In further consideration of the Partnership entering into

this Redemption Agreement, the Limited Partner, . . . hereby forever *releases* the Partnership and each of its . . . subsidiaries . . . from *any and all claims*, demands, suits, or causes of action of any nature whatsoever, whether known or unknown, including, without limitation, relating in any way to the Limited Partner's ownership of the Redeemed Units and the Limited Partner's status as a Limited Partner with respect to the Redeemed Units under the Partnership Agreement, the redemption of the Redeemed Units and the other transactions contemplated hereby, other than the transfer of Topco Shares.

(*Id.*)

The "Acknowledgment" in Section 3.4(e) asks Plaintiff to agree to the fact that he has read and understood the Agreement and had the ability to consult with, or was advised to consult with, an attorney. (*Id.*)

The Sales and Purchase Agreement contains similar whereas, release, and acknowledgement clauses. This agreement identifies Wowo as the seller and ITS as the purchaser of his shares.

The whereas clause provides that employment "the Seller's employment with the Purchaser and/or one of its Subsidiaries has terminated." (ECF No. 58, Ex. 10.)

The claims release is in Section 1, titled "Sale of the Relevant Topco Shares," subsection (e) and similarly states that Plaintiff will release "any and all claims," in consideration for the Agreement "including, without limitation," those related to the Topco Shares and his status as a stockholder of the Defendant:

In further consideration of the Purchaser entering into this Purchase Agreement, the Seller . . . hereby forever releases the Purchaser and each of its . . . subsidiaries . . . from any and all claims, demands, suits, or causes of action of any nature whatsoever, whether known or unknown, including, without limitation, relating in any way to the Seller's ownership of the Relevant Topco Shares and the Seller's status as a stockholder of the Purchaser, the Purchase of the Relevant Shares and the other transactions contemplated hereby, other than the payment of the Purchase Price. (*Id.*)

The acknowledgment in Section 2, titled "Representations and Warranties of the Seller," subsection (g), again asks Plaintiff to agree that he has read and

11

understood the document and had the opportunity to consult with, or been advised to consult with, an attorney. (*Id.*)

### b. Legal Standard

#### i. Summary Judgment

The party moving for summary judgment must show that there is no genuine issue as to any material fact. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case. *Celotex Corp*, 477 U.S. at 323-24. The Court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024).

#### ii. Waiver of Title VII Rights

A valid release of claims under Title VII is measured by the totality of the circumstances surrounding the plaintiff's execution of the release. *Stroman v. W. Coast Grocery Co.*, 884 F.2d 458, 462 (9th Cir. 1989). This approach is also followed by the majority of circuit courts. *See Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir. 1995) (collecting cases). Waivers of Title VII rights are closely scrutinized because of their remedial nature. *Stroman*, 884 F.2d at 461.

A general release of all claims is not presumptively valid unless there is sufficient evidence of an intent to release Title VII claims under the agreement. *See Torrez v. Public Service Co. of New Mexico*, 908 F.2d 687, 690 (10th Cir. 1990)

12

(genuine dispute of material fact whether agreement was clear and unambiguous where agreement failed to mention waiver of employment discrimination claims). The record must show that the waiver was "voluntary, deliberate, and informed." *Stroman*, 884 F.2d at 462. There are four key factors to this determination: clarity and lack of ambiguity in the agreement, the plaintiff's education and business experience, the presence of a non-coercive atmosphere, and the benefit of legal counsel. *Id.* A valid release must further be supported by adequate consideration. *Salmeron v. United States*, 724 F.2d 1357, 1362 (9th Cir. 1983).

"The validity and interpretation of a release of significant federal rights is governed by federal law." *Salmeron*, 724 F.2d at 1361. Under federal law, "[a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).

### c. **Analysis**

#### i. **Knowing and Voluntary Waiver**

Defendants argue that the Agreements constituted a knowing and voluntary waiver because the language of release was clear and unambiguous, Plaintiff had the requisite business and education experience to understand what he was signing, the environment was non-coercive because he was the one who requested the documents, and the Agreements he signed acknowledged he had the opportunity to consult with counsel. (ECF No. 60.) Plaintiff contends that any waiver of rights did not clearly and unambiguously encompass Title VII claims because they were contained in completely unrelated contracts. (ECF No. 75 at 8.)

#### 1. **Clear and Unambiguous**

A reasonable jury could find that the agreements Plaintiff signed did not clearly and unambiguously evince an intent to waive his rights under Title VII. It

is instructive that there is no prevailing case law granting a waiver of Title VII rights when the title and subject matter of the agreement is unrelated to the terms of a plaintiff's employment. Plaintiff requested documentation that would allow him to sell his shares in his partnership agreement. The documents are titled, "Redemption Agreement" and "Sales and Purchase Agreement." The Agreements' titles indicate neither a relationship to employment nor a waiver of any rights. *See Anzueto*, 357 F. Supp. 2d at 30.

Neither do the terms of the Agreements unambiguously point to an intent by Plaintiff nor Defendant to waive employment-related claims. The first article of each contract refers, respectively, to the redemption of redeemed units and the sale of relevant Topco shares. (ECF No. 59 at Exs. 9, 10.) In *Pittman v. American Airlines, Inc.*, the court found that although the agreement itself did not explicitly state that the plaintiff waived all claims arising from her termination, "the terms demonstrate that such was the intent of the parties" because it elaborated on the dispute concerning plaintiff's "performance record and future employment status." 2015 WL 2354439, at *4 (N.D. Okla. May 15, 2015). Here there is no such reference to Plaintiff's terms of employment or the resolution of any pending dispute.

There is also no mention of employment terms or conditions in the release itself. The clause that describes the claims "without limitation" begins with "relating in any way to the Limited Partner's *ownership of the Redeemed Units.*" (ECF No. 60, Ex. 9.) This does not put Plaintiff on notice that he is waiving his rights to employment-related claims. *See Nilsson*, 503 F.3d at 950. The Sixth Circuit found more even more explicitly job-related language insufficiently clear to operate as a release of Title VII claims. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 619 (6th Cir. 2024). In *Moore,* the court held that the release language, which provided that the employee, "releases and forever discharges the Company and the Union … from any and all liability of any kind whatsoever,

14

relating to his employment with the Company, arising prior to the date of this Agreement," was not "precise" in its explanation of what "any and all liability" referred to and presented a genuine dispute of material fact as to clarity. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 619 (6th Cir. 2024). While Defendant is correct that it did not need to explicitly list Title VII in its release to effectuate a valid waiver, the complete lack of reference to Plaintiff's employment or resignation within the scope of the waiver diminishes its clarity.

Defendant argues that because Plaintiff would not have shares to sell absent his employment relationship and he requested the ability to sell his stock after his resignation, the Agreements inherently and clearly "expand[ed]" the scope of the release to include employment discrimination claims. (ECF No. 60 at 9.) It relies on the preliminary recitals in the contract that identify Plaintiff as a "Seller" of stock to suggest that the Agreements actually had to do with his status as an employee. (*Id.*) The only reference to Plaintiff's employment separation is a single whereas clause in a list of five other whereas clauses. A prefatory clause, however, does not change an operative clause's plain meaning. *Kingdomware Technologies, Inc. v. U.S.*, 579 U.S. 162, 163 (2016). At the hearing, Defendant also suggested that if had Plaintiff so desired, he could have sold his shares in ITS before his resignation. This further attenuates the Agreements from Plaintiff's employment with Defendant and any intent to prevent Plaintiff from waiving his rights to litigate employment claims.

Defendant also points to how other courts have broadly construed the phrase, "including without limitation" in the context of construction defect litigation to suggest that it is necessarily expansive and clarifying, not limiting. (ECF No. 79 at 7.) The Court agrees that the term "including" is not limiting; however, a "written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Protective Ass'n*, 204 F.3d at 1210. The Court finds that

Defendant's interpretation goes beyond the scope of the Agreements, which only reference the redemption and sale and purchase of stock, not Plaintiff's employment.

Defendant claims that Plaintiff's knowledge of Title VII demonstrates that he had an intent to waive his rights when he signed the Agreements, citing *Stroman*. Although Plaintiff and Defendant were aware that Plaintiff was contemplating bringing a civil rights claim at the time of contracting in this case, *Stroman*'s waiver was entirely related to the plaintiff's economic layoff arrangement, explicitly stated that he was waiving claims "arising out of [his] employment," and he had already filed two charges of discrimination against his employer. *Stroman*, 884 F.2d at 460. Here, without the requisite knowledge that the waiver he was signing related to discrimination in the slightest, this awareness to bring a claim is less relevant.

Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that the agreements did not amount to a clear and unambiguous waiver of his Title VII claims.

## 2. Education and Business Experience

Courts have generally found that plaintiffs with a college degree and business experience are capable of understanding a clear waiver of their Title VII rights. *See Stroman*, 884 F.2d at 462-63 (plaintiff with business management-related community college degree and Army training had sufficient background to understand the agreement); *Nilsson*, 503 F.3d at 952 (plaintiff with college-level education and prior work experience with police department had sufficient education and experience to understand waiver); *cf. E.E.O.C. v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104 (D. Or. 2013), *on reconsideration in part* (Sept. 19, 2013)) (plaintiff with high school education did not have sufficient education and experience to understand waiver). Despite this, courts have held that a plaintiff's testimony that he did not understand that he was giving up certain rights can

still weigh against finding a waiver. *See Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 241 (S.D. N.Y. 2000) (despite the majority of the factors weighing in favor of waiver, court could not reject plaintiff's claim that she did not understand the waiver of her statutory rights on summary judgment).

Here, Plaintiff is a college graduate and has business experience with ITS as a logistics specialist working on third-party freight logistics, in addition to working as a marketing director for Amplified Entertainment. (ECF No. 58, Ex. 11.) Defendant argues that this is sufficient experience to understand the terms of the agreements he was signing. Plaintiff argues he is a layperson, and that a reasonable layperson would not know contract construction principles and would not be fully aware that he was waiving his Title VII rights based on the construction of the agreements. Because the Court has found that that the waiver itself did not unambiguously waive his Title VII rights, it is doubtful that Plaintiff's education and business experience would have made a difference in knowingly waiving those rights. Therefore, this factor is neutral.

### 3. Non-Coercive Atmosphere

Plaintiff does not dispute that he was in a non-coercive atmosphere at the time of signing the Agreements. He requested that the Defendant send him the documents and followed up several times requesting updates on the timeline of their approval. (ECF No. 58, Ex. 3.) Therefore, this factor weighs in favor of Defendant.

### 4. Benefit of Legal Counsel

It is also undisputed that Plaintiff did not consult with attorney, and that he was reminded he could do so by a representative of Defendant as part of the stock redemption process in response to a question on the accurate value of his shares.

When Plaintiff asked Defendant's HR Manager to "elaborate on the exact amount [he would] be receiving and how it breaks down exactly on the amount

that will be provided," she replied, "the Repurchase Notice states the amount calculated and the accompanying documents go into detail about the shares/units/purchase price. You can definitely have another legal representative review and answer any questions." (ECF No. 58, Ex. 6.) Plaintiff additionally signed the Agreements stating he was aware he could consult with, and/or did consult with, counsel before signing. (*Id.*, Ex. 9, Section 3.4(e).)

Although Plaintiff was not discouraged from accessing counsel, he still did not have the benefit of counsel when reviewing the Agreements. His communications regarding the Agreements reinforce the fact that he understood the agreements to concern his share redemption, since he asked specifically for the purpose of determining how much his shares would be worth. There is no indication in this exchange that he did or should have understood the agreements to deliberately waive his Title VII rights. This factor therefore only weighs slightly in favor of Defendant.

### 5. Totality of the Circumstances

Because clarity and lack of ambiguity is of "primary importance" in the analysis of waiver of Title VII, a reasonable jury could find that Defendant has not executed a voluntary, deliberate, and informed waiver of Plaintiff's Title VII rights in the Agreements. *Stroman*, 884 F.2d at 462. Having found that there is a dispute of fact regarding the validity of the waiver, the Court does not analyze the adequacy of consideration within the Agreements.

### ii.  Contractual Defenses

Plaintiff also raises several contractual defenses that he argues would foreclose the possibility of a waiver of his Title VII rights, including fraud by omission, equitable estoppel, and mistake of fact. (ECF No. 75 at 14-20.) Because there is a genuine dispute of material fact as to whether the Title VII waiver was knowing and voluntary, the Court does not analyze the contractual defenses posed by the Plaintiff at this time.

### IV.    Motion to Seal and Motion to Redact Transcript

There is a strong presumption in favor of public access to judicial filings and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). "[T]he strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments." *Kamakana*, 447 at 1179 (9th Cir. 2006). A party seeking to overcome this presumption with regards to a dispositive pleading or attachment thereto must "'articulate[ ] compelling reasons supported by factual findings' ... that outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'" *Id.* at 1178-79 (quotations omitted). "'[C]ompelling' reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes.'" *Kamakana*, 447 F.3d at 1179 (citations omitted).

Defendant filed an unopposed Motion to Seal certain exhibits of its Motion for Summary Judgment. (ECF Nos. 58, 59.) The Court previously granted Defendant's Motion to Seal Exhibits 2-10 because "[t]he exhibits at issue contain information regarding the agreements, which contain details about ITS's shareholder interest, corporate structure, and share value." (ECF No. 43.) Defendant has now added Exhibit 12 to its Motion, which is an "excerpt of the Shareholder Agreement that outlined the process that was followed by Exhibits 9 and 10 . . . which, if made public, could permit ITS's competitors to determine ITS's valuation and the value of each of ITS's shares." (ECF No. 58 at 4-5.)

Defendant also seeks to redact portions of the transcript from the December 11, 2024, hearing which contains allegedly confidential information subject to the Confidentiality Agreement and Stipulation for Entry of a Qualified Protective Order entered by this Court on July 16, 2024. (ECF No. 66 at 1-2.) The

19

Motion to Redact is unopposed. Defendant similarly argues that the hearing transcript contains confidential information that would harm its business standing and ability to negotiate. (*Id.* at 3.) It requests that the Court redact Page 11, lines 13–14; Page 12, line 9; and Page 16, line 18 of the transcript, which contain both financial and business-related information, while leaving non-sensitive information available to the public. (*Id.* at 4.)

"Where the material includes information about proprietary business operations, a company's business model or agreements with clients, there are compelling reasons to seal the material because possible infringement of trade secrets outweighs the general public interest in understanding the judicial process." *Selling Source, LLC v. Red River Ventures, LLC*, No. 2:09-CV-01491-JCM, 2011 WL 1630338, at *6 (D. Nev. Apr. 29, 2011).

Accordingly, the Court grants Defendant's Motion to Seal (ECF Nos. 58 and 59) and Motion to Redact Transcript (ECF No. 66.)

## V.     Conclusion

It is therefore ordered that Defendant's Motion to Dismiss (ECF No. 50) is DENIED.

It is furthered ordered that Defendant's Motion for Summary Judgment (ECF No. 60) is DENIED.

It is further ordered that Defendant's Motion to Seal (ECF Nos. 58 and 59) is GRANTED. The Clerk of the Court is kindly ordered to seal Exhibits 2-10 and Exhibit 12 of the Motion for Summary Judgment. (ECF No. 60.)

It is further ordered that Defendant's Motion to Redact Transcript (ECF No. 66) is GRANTED. The Clerk is kindly ordered to redact Page 11, lines 13–14; Page 12, line 9; and Page 16, line 18 of the hearing transcript. (ECF No. 54.)

//

//

//

20

Dated this 23rd day of March, 2026.

_____

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE